# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-1325V**
**Filed: July 16, 2026**

| | |
|---|---|
| JANICE WALKER,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Kimberly Sloan, Mctlaw, Seattle, WA, for petitioner.*
*Ryan Nelson, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION[1]

On May 6, 2021, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that she suffered a left arm cellulitis, as well as a left shoulder injury related to vaccine administration ("SIRVA"), following an influenza ("flu") vaccination she received on February 12, 2020. (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is *not* entitled to compensation.

### I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of vaccine administration. § 300aa-14(a), *amended by* 42 C.F.R. § 100.3. Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(c). To be considered a "Table SIRVA," a petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa-13(a)(1). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II. Procedural History

Although this case was initially assigned to the Special Processing Unit ("SPU"), it was subsequently reassigned to the undersigned on April 24, 2023. (ECF Nos. 20, 22, 40, 42.) After completing his medical review, respondent advised that he would litigate this case. (ECF No. 38.) He filed his Rule 4 Report on April 12, 2023. (ECF No. 39.) Respondent argued that (1) petitioner has not established that she received a covered vaccine in her left arm; (2) petitioner has not established a Table SIRVA both because she has prior neck and shoulder problems and because she has not established onset within 48 hours of vaccination, and (3) petitioner has not demonstrated causation-in-fact because her diagnosed cellulitis did not persist for six months and her allegation of a shoulder injury is not supported by medical theory or opinion. (*Id.* at 7-12.) Subsequently, I issued a finding of fact confirming that the evidence preponderates in favor of a left-sided administration of the subject flu vaccination. (ECF No. 55; *see also* 2024 WL 1517362 (Fed. Cl. Spec. Mstr. Mar. 13, 2024).)

Petitioner then filed an expert report by Naveed Natanzi, D.O. (ECF No. 64; Ex. 35), and respondent filed a responsive report by Geoffrey Abrams, M.D. (ECF No. 62; Ex. A).[3] Petitioner also filed a supplemental report by Dr. Natanzi responding to Dr. Abrams's report. (ECF No. 67; Ex. 55.) Thereafter, petitioner filed a motion for a ruling on the written record, which has been fully briefed. (ECF Nos. 73-75.)

In her motion, petitioner argues that she should be found entitled to compensation for either a Table Injury of SIRVA or a shoulder injury caused-in-fact by vaccination. (ECF No. 73-1, pp. 12-13.) Although she notes that her initial presentation included a post-vaccination cellulitis as was included in her initial petition, petitioner does not argue that her cellulitis represents a compensable injury. Instead, she argues that her initial cellulitis pain dissipated and argues only that her shoulder injury satisfied the statutory severity requirement by persisting for greater than six months. (*Id*. at 21-22, 32.) In his response, respondent argues that petitioner has not demonstrated either a Table SIRVA or a shoulder injury caused-in-fact by vaccination and further notes that petitioner's cellulitis alone does not meet the statutory severity requirement. (ECF No. 74.) In reply, petitioner stresses the view that her shoulder injury persisted for at least six months regardless of her cellulitis. (ECF No. 75.)

I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the

---

[3] Petitioner's expert report was initially filed on May 30, 2024, at ECF No. 58, and Dr. Abrams's responsive report was filed on September 13, 2024, at ECF No. 62. However, petitioner subsequently filed an unopposed motion to strike Dr. Natanzi's report due to a citation error (ECF No. 63), and petitioner's motion was granted. Petitioner filed a corrected copy of Dr. Natanzi's report on September 27, 2024, at ECF No. 64. Although Dr. Abrams did not file a further report, review of his report confirms that the incorrect citation was not material to his response to Dr. Natanzi's opinion.

record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

## III. Factual Summary

On February 12, 2020, petitioner received both a flu and pneumococcal vaccination at her primary care provider's office. (Ex. 3, pp. 18, 21.) For the reasons discussed in the prior finding of fact, the evidence preponderates in favor of a left-deltoid administration of the flu vaccine. (ECF No. 55; *see also* 2024 WL 1517362.) Petitioner was fifty-two years old at the time of vaccination. (Ex. 3, p. 18.) Her history included a number of chronic pain complaints, for which she saw a pain management specialist and treated with opioids. (Ex. 4.) In pertinent part, her history included neck pain since 2016 that was accompanied by numbness and tingling and that radiated into both shoulders and hands, which was diagnosed as cervical spondylosis. (*E.g.*, *id*. at 113-14, 123.) Prior to vaccination, this condition was documented throughout 2019 as including pain that "radiates down to the [right] > [left] shoulder and up from the base of the head mostly to the [right]." (Ex. 19, pp. 144, 148, 152, 156, 160, 164, 167.) Petitioner was seen for this complaint of neck pain, radiating to the shoulders, just two days prior to the vaccination at issue. (Ex. 4, pp. 30-32.)

Two days after the vaccination at issue, petitioner contacted her primary care physician. She reported that, after receiving her vaccinations, "[n]ow arm is very swollen, red, hot and she has a fever, feels horrible." (Ex. 5, p. 14.) She then presented to the emergency department that the same day with a chief complaint of "left arm pain." (Ex. 2, p. 6.) She reported that, "[i]n the last 48 hours, she has been having significant fevers and chills. She has also been having worsening left arm redness and swelling and profuse pain." (*Id*. at 8.) She also reported body aches, dizziness, and shortness of breath, but denied any weakness in her extremities or any numbness and tingling in her hands. (*Id*.) On physical exam, she had a diffuse area of swelling and erythema in the left deltoid area that was very painful to palpation, though she did not have evidence of drainable collection or necrotizing fasciitis. (*Id*. at 9, 12.) Petitioner reported that her pain was a 6 out of 10. (*Id*. at 11.) However, a physical exam of the upper extremity documented "no shoulder joint irritability." (*Id*.) Given the progression of the condition and the presence of elevated white blood cells, petitioner was admitted overnight for observation and IV antibiotics, despite her physical exam not indicating sepsis. (*Id*. at 6, 12.) Her final discharge diagnosis was "Left arm upper cellulitis." (*Id*. at 6.) As of discharge, petitioner reportedly "felt well" and "thinks the swelling and redness have gone down." (*Id*.)

Petitioner then followed up with her primary care provider on February 26, 2020, regarding her left arm cellulitis. (Ex. 3, pp. 14-17.) At that time, petitioner reported "[d]oing better today, still having soreness and slight limited [range of motion] [left upper extremity]." (*Id*. at 14.) Under review of systems, "shoulder problems and shoulder pain" were documented under musculoskeletal. (*Id*.) However, the musculoskeletal physical exam was limited to documenting "[m]ild tenderness left upper arm with slight redness." (*Id*. at 16.) The assessment and plan noted a diagnosis of cellulitis of the left

upper extremity and remarked that, following hospitalization, the cellulitis had improved after antibiotic treatment, but petitioner was still experiencing "tenderness at [the] injection site." (*Id*. at 16-17.) No specific follow up was instructed and petitioner was advised that "this will take time to fully resolve." (*Id*. at 17.) No shoulder injury was diagnosed, and no shoulder pathology was documented during this encounter.

In the months that followed, petitioner sought care for other complaints on several occasions. On March 9, 2020, she was seen by her pain management specialist for neck pain. (Ex. 4, p. 26.) As before, the pain was noted to radiate down to her right greater than left shoulder. (*Id*.) It was also noted to be worse "with [range of motion] and lifting." (*Id*.) Petitioner had pain and limited range of motion of the cervical spine, but physical exam of the shoulder was limited to noting that both internal abduction and external abduction were "5/5" for both the right and the left. (*Id*. at 27.) She had tenderness to palpation over the bilateral cervical paraspinals, as well as over the trapezius and greater occipital nerve, with right greater than left on both findings. (*Id*.) Her C7 and C8 dermatomes were noted to be abnormal on the left. (*Id*.) There was no specific complaint of left shoulder pain and no diagnosis of any shoulder pathology. Petitioner had further pain management follow ups for her neck pain via telehealth appointments on April 6, May 5, and June 9, 2020. (*Id*. at 15-25.) There were no specific complaints of shoulder pain during any of these telehealth encounters. During this period, petitioner also had two primary care encounters, at which no shoulder pain was reported. (Ex. 3, pp. 22-29.)

On June 30, 2020, petitioner then returned to her primary care provider. (Ex. 3, p. 10.) At that time, her chief complaint was "left shoulder pain" and she reported "ongoing left shoulder pain since getting flu and PPSV-23 vaccines in February. . . . Infection improved but still has left deltoid pain without swelling or redness. Feels slight limited ROM with flexion and abduction in addition to 'pop.' Denies previous injuries to left shoulder." (*Id*.) It is also recorded that petitioner had associated symptoms of numbness and tingling of the left upper extremity, though a history of carpal tunnel syndrome is noted. (*Id*.) Review of systems noted in relevant part "arthralgias, joint stiffness, shoulder problems, shoulder pain and pain in the upper arm, but no joint swelling." (*Id*.) Physical exam of the left shoulder indicated: "inspection reveals normal appearance. Palpation of the left shoulder reveals AC joint tenderness and deltoid tenderness. ROM exam shows full ROM except as noted. Forward flexion: painful normal AROM. Abduction: painful restricted AROM. Special tests show negative Drop Arm test and negative Empty Can test." (*Id*. at 12.) Petitioner was diagnosed with "chronic left shoulder pain" and an MRI was ordered. (*Id*.)

Petitioner underwent a left shoulder MRI on August 7, 2020. (Ex. 2, p. 2.) It showed infraspinatus tendinosis involving the posterior 50% of the infraspinatus tendon at the humeral attachment with a partial thickness tear extending from the humeral attachment through the bursal surface and 5-6 millimeters into the tendon. There were also "a few tiny degenerative cystic foci" and "trace overlying subdeltoid bursitis." (*Id*.) Thereafter, petitioner mentioned her shoulder pain to her pain management specialist for the first time on August 24, 2020. (Ex. 4, p. 10.)

Petitioner was incarcerated for five months, beginning in August of 2020. (Ex. 19.) She asserts in her motion that as a result she was "unable to seek regular treatment for her left shoulder injury." (ECF No. 73-1, p. 4.) However, although it may be true that petitioner did not have access to her regular medical providers while incarcerated, the prison records filed by petitioner do confirm that she had access to medical care, which she utilized. (Ex. 19.) During her intake screening, petitioner did include shoulder pain in her explanation of her chronic pain complaints for which she was taking opioid medication. (*Id*. at 19, 197.) However, shoulder pain and/or dysfunction is not otherwise addressed in petitioner's prison medical records. Petitioner confirmed in a written statement that she did not seek care for her shoulder pain while she was incarcerated, though she indicates her pain persisted. (Ex. 20, pp. 1-2.)

Petitioner returned to her pain management specialist on April 1, 2021. (Ex. 21, p. 9.) The encounter focused on petitioner's neck. The neurologic exam of petitioner's upper extremities indicated "5/5" shoulder range of motion. She had abnormal right and left dermatomes at C5 and C6. (*Id*. at 11.) No specific complaint of left shoulder pain was documented. Later that month, petitioner reestablished care with her primary care provider via a telehealth encounter and noted an upcoming orthopedic follow up for her left shoulder. (Ex. 7, p. 28.)

Petitioner later presented to an orthopedist on June 24, 2021. She provided the following history:

53 yo RHD female presents with left shoulder pain that began February 12th, 2020 after she got a flu and pna vaccine in the left arm. Four days after receiving the vaccines, patient was admitted for cellulitis. She has had pain ever since. Pain is a deep, dull ache that is worse posteriorly. She denies any type of trauma. Activity, lifting objects, abduction make it worse. No activity makes it better. Current pain is a 3/10. Patient has been taking hydrocodone and ibuprofen for pain. She goes to pain management for neck pain, bilateral bunions and a ganglion cysts on left foot. Has not participated in PT. Ibuprofen does help. No other conservative management at this time.

ROS: Denies numbness, tingling, paralysis of injured extremity.

(Ex. 13, p. 1.) On physical exam, petitioner had no tenderness to palpation at the bony prominence, deltoid, trapezius, biceps tendon, or bicipital groove. (*Id*. at 3.) Her passive and active range of motion was 170 degrees for flexion, 60 degrees for extension, 180 degrees for abduction, and 80 degrees for external rotation. (*Id.*) Internal rotation was noted to be limited with petitioner able to reach T12 bilaterally. (*Id*.) No abnormalities were recorded on neuromuscular exam or upon special tests (empty can, drop arm, lift off, O'Brien's, Speed's, and bear hug), though the bear hug test did cause pain. (*Id*. at 3-4.) X-rays were unremarkable. (*Id*. at 4.) Petitioner's August 7, 2020 MRI was also reviewed. (*Id*.) The diagnosis was "Chronic left shoulder pain," and a referral to physical therapy was made. (*Id*. at 5.)

Petitioner presented for a physical therapy initial evaluation on July 26, 2021. (Ex. 25, p. 15.) Petitioner associated her complaint of left shoulder pain to her prior vaccination and indicated that her symptoms were "slightly better since onset." (*Id*.) She reported that aggravating factors included overhead movement, lifting, pushing,

and pulling, and further reported functional limitations with lifting and reaching, though she denied having difficulty with her activities of daily living. (*Id.*) Range of motion was documented as follows:

| • Range of Motion Deficits: | (L) AROM | (R) AROM | (L) PROM (R) |
|---|---|---|---|
| Shoulder flexion | 165° | 165° | Full and pain-free |
| Shoulder extension | 75° | 75° | bilaterally throughout |
| External rotation | 85° | 85° | all major ranges. |
| Internal rotation | 80° | 80° | |
| Shoulder abduction | *165° | *170° | |
| Horizontal adduction | 130° | 130° | |
| Behind the back | * T12 | * T12 | |

Painful arc? ☐ Yes ☑ No

Accessory Motion: normal mobility (B) GH, AC, SC

(*Id.*) The physical therapist's assessment was that petitioner presented with complaints of limitations in functional use of her left upper extremity due to shoulder pain. (*Id.* at 16.) However, it was also noted that ,"[t]hroughout assessment, [patient] reporting similar pain bilaterally." (*Id.*) The physical therapist indicated that labral or rotator cuff issues were suspected, but documented "pain apparently myofascial in nature." (*Id.*)

Petitioner subsequently attended further physical therapy sessions and also had a home exercise program. (Ex. 25, pp. 11, 22; Ex. 15, p. 2.) As of September 2, 2021, she indicated that her pain and reduced range of motion were improving and declined a corticosteroid injection. (Ex. 15, p. 2.)

Further medical records have been filed; however, they do not specifically discuss petitioner's shoulder pain. As reflected above, she was never given any specific diagnosis to explain her left shoulder pain. On March 3, 2022, petitioner was seen by an anesthesiologist for her chronic neck pain and migraines. She did not specifically mention shoulder pain at this encounter and range of motion was not tested. (Ex. 28, p. 14.) The anesthesiologist felt petitioner's clinical presentation correlated with inflammatory nociceptive and neuropathic pain components, with differential diagnoses that included migraines, degenerative cervical disc disease, spondylolisthesis, disc protrusion or herniation, facet arthropathy, muscle spasms, and myofascial pain. (*Id.* at 19.)

## IV. Expert Reports

Based on his review of petitioner's medical history, Dr. Natanzi[4] opines that petitioner experienced left shoulder pain beginning within two days of her vaccination

[4] Dr. Natanzi received his medical degree in osteopathic medicine from Western University of Health Sciences in Pomona, California, in 2012, followed by an internship at Downey Regional Medical Center in Downey, California, in 2013, and a residency at University of California, Irvine, in 2016. (Ex. 34, pp. 1-2.) From there, Dr. Natanzi completed a fellowship in interventional regenerative sports and spine medicine at Bodor Clinic in 2017. (*Id.* at 1.) He accepted a position as an attending physician at Pasadena Rehab Institute in Pasadena, California, in 2017, before going on to found Regenerative Sports and Spine

and that this shoulder pain was thereafter continuous until at least September of 2021 when she later sought orthopedic care. (Ex. 35, p. 4.) He acknowledges that petitioner also had a transient cellulitis, but characterizes this as "coincidental and confounding." (*Id.*) Dr. Natanzi also acknowledges that petitioner had a long history of chronic cervical radiculopathy. (*Id.*) Although he acknowledges that "cervical radiculopathy can cause pain in and throughout the shoulder," in petitioner's case he notes that the preceding cervical radiculopathy had affected the right more than left limb. (*Id.*) He opines that the symptoms petitioner experienced post-vaccination can be distinguished from the preexisting cervical radiculopathy. (*Id.*) Specifically,

> the findings of limited range of motion in the left shoulder (Exhibit 3 at 10, Exhibit 13 at 1, and Exhibit 25 at 15) and shoulder pain with lifting, abduction, and activities (Exhibit 13 at 1) are those that would be expected uniquely in a shoulder condition and not in a cervical condition.

(*Id.*) Dr. Natanzi further suggests that the significance of the acute onset of these symptoms within hours of vaccination "cannot be overemphasized." (*Id.*) The idea that a cervical radiculopathy would flare in response to a vaccination is inexplainable. (*Id.* at 4-5.) Dr. Natanzi suggests "[t]here is inarguably a clinical history shift that occurs after vaccination," which "coincides with a protracted course of pain during the use of the left shoulder that she had no history of prior to the vaccination" and which would not be expected with a cervical radiculopathy. (*Id.* at 5.) Moreover, Dr. Natanzi interprets petitioner's left shoulder MRI of August 7, 2020, as showing fluid collection on top of the infraspinatus tendon, which he opines represents vaccine-mediated inflammatory fluid resulting from overpenetration of the injection needle. (*Id.* at 5-6 (citing Ex. 2, p. 2).)

Assuming that the presence of cervical radiculopathy would preclude a Table claim, Dr. Natanzi set forth an opinion based on the *Althen* test for causation-in-fact. (Ex. 35, pp. 7-8.) He cites several articles from medical literature for the proposition that the medical theory underlying SIRVA is well established. (*Id.* at 7 (citing Maj Sofia Szari et al., *Shoulder Injury Related to Vaccine Administration: A Rare Reaction*, 36 FED. PRACTITIONER 380 (2019) (Ex. 37); L.H. Martín Arias et al., *Risk of Bursitis and Other Injuries and Dysfunction of the Shoulder Following Vaccinations*, 35 VACCINE 4870 (2017) (Ex. 38); Christopher V. Macomb et al., *Treating SIRVA Early with Corticosteroid Injections: A Case Series*, 185 MILITARY MED. e298 (2020) (Ex. 40); Ian F. Cook, *An Evidence Based Protocol for the Prevention of Upper Arm Injury Related to Vaccine Administration (UAIRVA)*, 7 HUM. VACCINES 845 (2011) (Ex. 41); Alexandra Wright et al., *Influenza Vaccine-Related Subacromial/Subdeltoid Bursitis: A Case Report*, 13 J. RADIOLOGY CASE REPS. 24 (2019) (Ex. 45); Matthew G. Barnes et al., *A "Needling"*

---

Institute in Sherman Oaks, California. (*Id.*) He maintains positions as a staff physician at VA Long Beach Healthcare System in Long Beach, California, as well as medical director at Tova Surgical Center and Bayshore Surgical Center in Sherman Oaks, California. (*Id.*) He is board certified in pain management and physical medicine and rehabilitation, with fellowship training in interventional sports and spine medicine, and he maintains a medical license in California. (*Id.*; Ex. 35, p. 1.) In his clinical capacity, he "almost exclusively treat[s] musculoskeletal issues included but not limited to the shoulder joint," and he diagnoses and treats approximately 100 shoulder pathologies per month. (Ex. 35, p. 1.) He has authored 8 publications. (Ex. 34, p. 3.)

*Problem: Shoulder Injury Related to Vaccine Administration*, 25 J. AM. BD. FAM. MED. 919 (2012) (Ex. 46; *see also* Ex. A, Tab 1); Ian F. Cook et al., *Subdeltoid/Subacromial Bursitis Associated with Influenza Vaccination*, 10 HUM. VACCINES & IMMUNOTHERAPEUTICS 605 (2013) (Ex. 47); I. Degreef & Ph. Debeer, *Post-Vaccination Frozen Shoulder Syndrome. Report of 3 Cases*, 112 ACTA CHIRURGICA BELGICA 447 (2012) (Ex. 48); Zeina M. Saleh et al., *Onset of Frozen Shoulder Following Pneumococcal and Influenza Vaccinations*, 14 J. CHIROPRACTIC MED. 285 (2015) (Ex. 51); J.H. Salmon et al., *Bone Erosion and Subacromial Bursitis Caused by Diphtheria-Tetanus-Poliomyelitis Vaccine*, 33 VACCINE 6152 (2015) (Ex. 52)).) He indicates that this literature identifies misplaced and over-penetrating vaccine injections as a causal factor of prolonged pain and musculoskeletal dysfunction, including rotator cuff injuries, of the shoulder due to immune-mediation reactions. (*Id*. at 7-8 (citing Soshi Uchida et al., *Subacromial Bursitis Following Human Papilloma Virus Vaccine Misinjection*, 31 VACCINE 27 (2012) (Ex. 39)).) In this case, petitioner experienced onset of shoulder pain within a short time after vaccination. (*Id*. at 8.) Although it was initially attributed to cellulitis, it persisted and her shoulder injury was eventually detected by subsequent evaluation. (*Id*.) This presentation, along with the MRI finding of collected fluid he identified, aligns with the medical theory presented. (*Id*.) Based on the literature underlying the theory, the onset of shoulder pain within 48 hours of vaccination supports a casual inference. (*Id*. (citing Michael Shahbaz et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 67 WORKPLACE HEALTH & SAFETY 501 (2019) (Ex. 36; *see also* Ex. A, Tab 4)).) Dr. Natanzi does not feel that petitioner's delay in seeking orthopedic care is instructive of the initial onset of her shoulder pain. (*Id*.) Thus, having concluded that petitioner's presentation meets all three *Althen* prongs, Dr. Natanzi opines that her shoulder injury was vaccine caused. (*Id*. at 9.)

In response, Dr. Abrams[5] opines on respondent's behalf that petitioner's clinical course is better explained by her temporary cellulitis and her pre-existing cervical radiculopathy. (Ex. A, p. 11.) In particular, Dr. Abrams stressed that petitioner sought treatment for her cervical radiculopathy both before and after vaccination, complaining of the same symptoms, and he disagrees that she had any significant loss of motion in the shoulder, which he considers a hallmark of SIRVA. (*Id*. at 11-12.) With regard to the three examinations cited by Dr. Natanzi, Dr. Abrams contends the range of motion observed is consistent with normative values from the available literature. (*Id*. at 12-13 (citing Tiffany K. Gill et al., *Shoulder Range of Movement in the General Population:*

[5] Dr. Abrams received his medical degree from the University of California, San Diego, in 2007, before going on to complete a surgical internship in the Department of General Surgery and a residency in the Department of Orthopedic Surgery at Stanford University Hospital and Clinics in 2008 and 2012, respectively, followed by a fellowship in Orthopedic Sports Medicine at Rush University Medical Center in Chicago, Illinois, in 2013. (Ex. B, pp. 1-2.) From there, Dr. Abrams briefly worked as a clinical instructor at Rush University Medical Center, before accepting a position as an attending physician at Veterans Administration Hospital in Palo Alto, California, as well as an assistant professor in the Medical Center Line at Stanford University School of Medicine, in 2013. (*Id.* at 1.) He was eventually elevated to associate professor in 2021. (*Id.*) Dr. Abrams is board certified in orthopedic surgery with a subspecialty in orthopedic sports medicine, and he maintains an active medical license in California. (*Id.* at 2.) He has "a surgical practice focused on orthopedic conditions of the shoulder and [has] also published extensively on shoulder and other musculoskeletal pathology, with over 130 total peer-reviewed publications." (Ex. A, p. 1.)

*Age and Gender Stratified Normative Data Using a Community-Based Cohort*, 21 MUSCULOSKELETAL DISORDERS 676 (2020) (Ex. A, Tab 5); M. Anderton et al., *Normal Range of Motion of the Shoulder; An Imprecise Benchmark*, 94 ORTHOPEDICS PROCS. 127 (2012) (Ex. A, Tab 6)).) Moreover, these physical exams also indicate that her left and right range of motion are similar. (*Id*.) Although the June 30, 2020 primary care encounter documented a limitation of abduction, the literature cited by Dr. Natanzi indicates that limitations in forward flexion would have been expected in SIRVA. (*Id*. at 13.) In SIRVA, significant range of motion deficits of less than 90-100 degrees of flexion and abduction are expected, but this was not petitioner's presentation. (*Id*. (citing Barnes et al., *supra*, at Ex. A, Tab 1; Marko Bodor & Enoch Montalvo, *Vaccination-Related Shoulder Dysfunction*, 25 VACCINE 585 (2007) (Ex. A, Tab 2); Shahbaz et al., *supra*, at Ex. A, Tab 4; S. Atanasoff et al., *Shoulder Injury Related Vaccine Administration (SIRVA)*, 28 VACCINE 8049 (2010) (Ex. A, Tab 7)).) Further still, petitioner also had additional medical encounters for pain management, during which there was no mention of shoulder pain. (*Id*.) In response to Dr. Natanzi's interpretation of petitioner's left shoulder MRI, Dr. Abrams stresses that the finding of fluid cited by Dr. Natanzi was noted to have only been "trace," which he further suggests is a common finding on MRI and distinguishable from the extensive bursitis, bone bruising, and soft tissue edema that would be expected in SIRVA. (*Id*. at 16 (citing Sarah K. Eustace et al., *MRI Findings in Atraumatic Shoulder Pain—Patterns of Disease Correlated with Age and Gender*, 192 IRISH J. MED. SCI. 847 (2023) (Ex. A, Tab 14); Gokcan Okur et al., *Magnetic Resonance Imaging of Abnormal Shoulder Pain Following Influenza Vaccination*, 43 SKELETAL RADIOLOGY 1325 (2014) (Ex. A, Tab 15)).) Thus, he opines that petitioner's MRI reflects typical findings for petitioner's age, rather than evidence of a SIRVA. (*Id*.)

In addition to opining that petitioner's presentation is not consistent with the type of inflammatory reaction of the bursa expected in SIRVA, Dr. Abrams also affirmatively opines that petitioner's diagnosed cellulitis and cervical radiculopathy do reasonably explain her presentation. (Ex. A, pp. 14-16.) First, Dr. Abrams stresses that cellulitis, a localized infection, causes pain, redness, and swelling at the affected area, which was specifically documented when she presented to the emergency department. (*Id*. at 14 (citing Ex. 2, p. 8).) Pain from cellulitis can last weeks to months and, in petitioner's case, she reported symptoms through about June 30, 2020, about four months post-vaccination, after which she had no documented complaints of shoulder pain for about a year. (*Id.*) And, consistent with her presentation, Dr. Abrams notes that cellulitis, though painful, is not associated with reduced range of motion of the shoulder. (*Id*. (citing Tadhg Sullivan & Eoghan de Barra, *Diagnosis and Management of Cellulitis*, 18 CLINICAL MED. (LOND. ENG.) 160 (2018)).) Thus, Dr. Abrams opines that petitioner's reported shoulder pain during the four months following vaccination was attributable to her cellulitis, rather than a SIRVA. (*Id*.) Second, it is well documented that cervical radiculopathy can cause shoulder pain. (*Id*. at 14-15.) Dr. Abrams listed four considerations that can distinguish a cervical etiology for shoulder pain: (A) burning or electric pain classically starting in the neck and radiating through the shoulder; (B) associated numbness and tingling; (C) a pattern consistent with a nerve root origin (most commonly at C5-C6); and (D) pain in the lateral portion of the shoulder girdle. (*Id*.

at 15 (citing Steven L. Bokshan et al., *An Evidence-Based Approach to Differentiating the Cause of Shoulder and Cervical Spine Pain*, 129 AM. J. MED. 913 (2016) (Ex. A, Tab 13)).) According to Dr. Abrams, petitioner had all four of these findings, which "strongly" suggests the symptoms she began reporting in June of 2021 were due to her longstanding cervical spine pathology. (*Id*. at 16.)

Responding to Dr. Abrams, Dr. Natanzi stresses that range of motion deficits in SIRVA are typically pain-induced, rather than mechanical. (Ex. 55, p. 1.) Therefore, the deficits can be variable due to differing pain tolerances and "there is not always a clear linear relationship between [range of motion] limitations and the intensity of the disease." (*Id.* at 1-2.) In that regard, he notes that the QAI criteria for a Table SIRVA do not quantify how much of a reduction in range of motion is necessary. (*Id*. at 2.) Ultimately, Dr. Natanzi concedes that petitioner's range of motion deficits were not significant, but nonetheless opines that they were present. Nonetheless, he suggests that about 15% of the SIRVA subjects observed by Atanasoff et al. did not have a confirmed reduction in range of motion. (*Id.*) Dr. Natanzi urges that the experts should defer to petitioner and the treating physicians, who distinguished petitioner's left shoulder complaints as a new, post-vaccination complaint distinct from her prior cervical radiculopathy. (*Id*. at 2-3.) He stresses that petitioner's treating physicians were aware of the prior cervical radiculopathy and that having a prior cervical radiculopathy does not mean she cannot also suffer a shoulder condition. Nor does petitioner's diagnosed cellulitis necessarily imply that she did not suffer a SIRVA – "[b]oth diagnoses can exist at the same time and the existence of one does not take away from the existence of the other." (*Id*. at 3.) Dr. Natanzi concedes that the fluid seen on petitioner's MRI was not extensive and, in fact, "someone off the street with no shoulder pain can demonstrate even more fluid than was observed on [petitioner's] MRI." (*Id.*) However, he opines that it is the clinical history that makes petitioner's MRI finding notable for SIRVA. (*Id.*) He also notes that, because the MRI was not performed until six months after the SIRVA began, some of the accumulated fluid may have already resorbed. (*Id*.) Dr. Natanzi agrees that petitioner's gap in care from 2020 to 2021 makes it more difficult to interpret her history, but he opines that Dr. Abrams suggestion of two distinct processes – cellulitis then later cervical radiculopathy – is refuted by the June 24, 2021 orthopedic record, given that Dr. Horvath at that time documented that petitioner had been experiencing pain "ever since" vaccination and diagnosed a "chronic shoulder problem." (*Id*. at 3-4 (citing Ex. 13, p. 1).)

## V. Analysis

Based upon consideration of the record as a whole, petitioner has neither demonstrated a Table SIRVA nor a shoulder injury caused-in-fact by her vaccination. In the analysis that follows, the SIRVA QAI criteria are taken out of order for clarity. First, timing is addressed under the second SIRVA criterion. Under that analysis, it is concluded that petitioner's initial post-vaccination presentation represented cellulitis, which did not include shoulder pain. Accordingly, there is not preponderant evidence that petitioner experienced a new onset of left shoulder pain within 48 hours of vaccination. Thereafter, the analysis turns under the fourth criterion to whether the

shoulder pain that did exist would be attributable to another condition. On that point, Dr. Abrams is more persuasive than Dr. Natanzi in contending that petitioner's preexisting cervical radiculopathy would explain her symptoms. Analysis of the first and third criteria flows directly from that conclusion. An analysis of petitioner's alternative cause-in-fact claim follows; however, her showing under the applicable *Althen* test suffers for many of the same reasons as her Table claim.

a. SIRVA QAI (2) – Pain occurs within the specified time-frame (*i.e.* 48 hours)

The second SIRVA criterion requires that the petitioner experience an onset of shoulder pain within 48 hours of the vaccination at issue. 42 C.F.R. § 100.3(c)(10)(ii). The Vaccine Act explicitly instructs that a special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." § 300aa-13(b)(2). However, such a finding must in all events be supported by preponderant evidence. *Id*.

Petitioner argues that the medical records demonstrate from the time she first presented to the emergency department on February 14, 2020, that she had a new onset of left shoulder pain. (ECF No. 73-1, pp. 19-20.) Respondent argues, however, that any post-vaccination shoulder pain was simply consistent with her pre-existing cervical radiculopathy. Thus, respondent implicitly argues that there was no new onset of left shoulder pain post-vaccination. Moreover, on respondent's behalf, Dr. Abrams opines that petitioner's initial, more acute post-vaccination presentation is explained by her diagnosed cellulitis, which could also encompass shoulder discomfort. (Ex. A, p. 14.)

Consistent with respondent's view, I am not persuaded that petitioner has preponderantly demonstrated that she suffered a new onset of left shoulder pain within 48 hours of her vaccination. Although petitioner did promptly seek care for left *arm pain* that began within 48 hours of vaccination, this was ultimately diagnosed as cellulitis and her contemporaneous medical records do not document any accompanying shoulder pain at that time. Indeed, although petitioner complained of upper extremity pain related to her cellulitis, her hospital records confirmed that, at two days post-vaccination, she had "no shoulder joint irritability." (Ex. 2, p. 11.) Regardless of whether petitioner went on to develop distinct left shoulder pain at any later point, the observations made during her hospitalization, which do not include any indication of shoulder pain, are strong evidence that the onset of any shoulder pain did not occur within 48 hours of vaccination, especially given that she initially presented for this case at just about 48 hours post-vaccination.

The Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an

extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Indeed, petitioner's own written declaration, though it indicates residual shoulder soreness following hospitalization, likewise describes her initial presentation prior to hospitalization as consisting of injection site and arm pain, rather than shoulder pain. (Ex. 6, p. 1.) When petitioner later presented for follow up with her primary care provider, that provider did document within the review of systems that her complaint included shoulder pain (Ex. 3, p. 14); however, the physical exam instead indicated only mild tenderness of the left upper arm (*Id*. at 16). From the time of the February 12, 2020 vaccination through June 30, 2020, petitioner's medical records document no shoulder injury or shoulder pathology.

Instead, during this period, petitioner continued to seek care for her cervical radiculopathy, which otherwise included established reports of pre-existing left shoulder pain. (Ex. 4, pp. 15-28.) Although petitioner averred that her post-vaccination left shoulder pain was distinct (Ex. 6, p. 1), her contemporaneous pain management treatment records confirm that her left shoulder pain remained stable post-vaccination. That is, in seeking ongoing care for her cervical radiculopathy inclusive of symptoms radiating to her shoulders, she reported the same severity of pain (on a 10-point scale) both before and after vaccination, consistently reporting pain of 3 out of 10 with medication and 7 out of 10 without medication.[6] (*Compare* Ex. 4, pp. 26-27, *with id.* at 30-32, *and id.* at 23-25.) Thus, contemporaneous treatment records pertaining specifically to left shoulder pain do not support any change in that symptom. And, significantly, the record confirms that petitioner did report her recent history of cellulitis at her March 9, 2020 pain management encounter. (*Id.* at 26-27.) Accordingly, it is not the case that petitioner felt her post-vaccination issue to be irrelevant to this provider or simply refrained from providing updated medical information at this encounter.

To be sure, the medical records from June 30, 2020, onward document that petitioner subjectively perceived the onset of a new condition post-vaccination (*e.g.*, Ex. 3, p. 10 (reporting "ongoing left shoulder pain since getting flu and PPSV-23 vaccines in February")); however, for the reasons discussed below, Dr. Abrams is more persuasive than Dr. Natanzi in opining that what petitioner experienced were the effects of her diagnosed cellulitis and cervical radiculopathy, rather than any new shoulder condition. Petitioner aptly quoted, albeit for a different purpose, the following from another special master: "The human body and individual perceptions and symptoms do not necessarily fall neatly into a precise pattern, and how an individual perceives and articulates their symptoms of pain and sensation is unique to that individual. Often those complaints can appear to be something they are not." (ECF No. 73-1, p. 16 (quoting *Weinberg v. Sec'y of Health & Human Servs*., No. 20-271V, 2025 WL 1218536, at *10 (Fed. Cl. Spec. Mstr. Apr. 2, 2025)).) Indeed, although Dr. Natanzi felt a separate shoulder injury

[6] There is a different notation that separately indicates more broadly that petitioner reported pain of 5/10 on just one occasion on March 9, 2020. (*Compare* Ex. 4, p. 26, *with id*. at 23, 30.) However, this notation is ambiguous when compared to the more specific notations of pain levels with and without medication. Moreover, it was only transiently increased around the time petitioner was suffering cellulitis. (*Id*.)

could be discerned, he acknowledged that petitioner's undisputed cellulitis was "confounding" with respect to assessing her post-vaccination clinical presentation. (Ex. 35, p. 4.)

Accordingly, petitioner has not met her preponderant burden of proof under the second SIRVA criterion.

b. SIRVA QAI (4) – No other condition or abnormality is present that would explain the patient's symptoms.

The fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." 42 C.F.R. § 100.3(c)(10)(iv). This element of petitioner's showing "requires consideration of a petitioner's medical condition as a whole." *Record v. Sec'y of Health & Human Servs.*, 175 Fed. Cl. 673, 680 (2025). While the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation." *French v. Sec'y of Health & Human Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023). Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis. *Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *13-14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions). Ultimately, where the presence of another condition is apparent, petitioner bears the burden of proving that the condition nonetheless "would not explain" her symptoms. *Id*. at *14.

In this case, it is undisputed that petitioner had a pre-existing cervical radiculopathy. (ECF No. 73-1, pp. 20-21.) Moreover, Dr. Natanzi agrees on petitioner's behalf that such a cervical radiculopathy can cause pain in and throughout the shoulder. (Ex. 35, p. 4.) And, indeed, petitioner's medical records clearly document as little as two days prior to the vaccination at issue that her cervical radiculopathy included pain that radiated into her shoulders, bilaterally. (Ex. 4, pp. 30-32.) Petitioner argues, however, that there is also objective evidence of a shoulder injury unrelated to her radiculopathy and, therefore, the presence of a cervical radiculopathy does not mean that she did not also suffer a SIRVA. (ECF No. 73-1, p. 21.) In sum, petitioner argues that she suffered post-vaccination symptoms that would not be explained by her cervical radiculopathy. Based on consideration of the record as a whole, petitioner is not persuasive on this point.

First, Dr. Natanzi stresses that, prior to vaccination, petitioner's cervical radiculopathy affected her right shoulder more than her left shoulder. (Ex. 35, p. 4.) This is true, but not ultimately informative. Just prior to the vaccination at issue, petitioner presented for pain management of her longstanding neck pain and it was confirmed that her pain radiated to her shoulders, bilaterally. (Ex. 4, p. 30.) Moreover, although petitioner's subjective report was that her pain was worse on the right than the

left, her physical exam confirmed that she had abnormal left-side dermatomes at C7 and C8. (*Id.* at 31.) When petitioner returned to pain management weeks after the vaccination at issue, she reported her history of an injection site cellulitis (*Id*. at 27); however, her history of present illness and physical exam remained essentially unchanged (*Id*. at 26-27). Accordingly, the medical records confirm that petitioner had ongoing left-side cervical radiculopathy symptoms both before and after vaccination. Moreover, she reported the same severity of pain (on a 10-point scale) both before and after vaccination. (*Compare* Ex 4, p. 26, *with id.* at 23, 30. *But see* note 6, *supra*.) The fact that petitioner complained of even greater right-side pain does not detract from the fact that she was also consistently experiencing left-side symptoms.

Second, Dr. Natanzi opines that petitioner's post-vaccination symptoms can be distinguished from her pre-existing radiculopathy because "the findings of limited range of motion in the left shoulder and shoulder pain with lifting, abduction, and activities are those that would be expected uniquely in a shoulder condition and not in a cervical condition." (Ex. 35, p. 4 (internal citations omitted).) However, Dr. Abrams is persuasive in noting that petitioner's documented deficits were so minimal that many of the findings are actually consistent with normative findings. (Ex. A, pp. 12-13 (citing Gill et al., *supra*, at Ex. A, Tab 5).) Moreover, when petitioner ultimately presented for her physical therapy evaluation, she had completely normal passive range of motion and her active range of motion was identical in both shoulders. (*Id*. at 13 (discussing Ex. 3, p. 15).) Thus, although one orthopedic record did document painful, restricted abduction (Ex. 7, p. 34), Dr. Abrams persuasively opines that, when considering the records as a whole, shoulder range of motion "was not limited to any appreciable amount." (Ex. A, p. 13.)

Third, Dr. Natanzi opines that there was "inarguably a clinical history shift that occurs after vaccination" and that petitioner developed symptoms of limited range of motion of the left shoulder and shoulder pain with lifting and abduction within "mere hours" of her ipsilateral vaccination, a point that "cannot be overemphasized." (Ex. 35, pp. 4-5.) However, this assertion is not preponderantly supported for the reasons discussed in the preceding section. Although petitioner did promptly seek care for left arm pain post-vaccination that began within 48 hours of vaccination, her condition was ultimately diagnosed as cellulitis and her contemporaneous medical records do not document any accompanying shoulder pain or dysfunction at that time. Indeed, despite multiple medical encounters in the interim, Dr. Natanzi has not pointed to any evidence of reduced or painful range of motion until June 30, 2020, about four and a half months post-vaccination.[7] (Ex. 35, p. 2 (discussing Ex. 3, p. 10).) Dr. Natanzi stresses that, at that time, petitioner complained of shoulder pain "ever since" her vaccination, which he contends undermines the suggestion that it is due to a temporary cellulitis superimposed on a pre-existing cervical radiculopathy. (Ex. 55, p. 3 (discussing Ex. 13,

[7] Of note, there is no timing requirement for the presentation of reduced range of motion under the SIRVA criteria. *Accord Dawson v. Sec'y of Health & Human Servs*., No. 19-278V, 2021 WL 5774655, at *4 (Fed. Cl. Spec. Mstr. Nov. 4, 2021). However, Dr. Natanzi has nonetheless incorporated an abrupt post-vaccination change in symptoms into his diagnostic opinion. Accordingly, it is necessary to evaluate that contention in order to assess the bases for Dr. Natanzi's opinion even though petitioner would not otherwise bear a burden of demonstrating any specific timing of onset for her reduced range of motion.

p. 1).) However, Dr. Natanzi does not account for the fact that the history petitioner provided at that encounter is inconsistent with her prior medical records.

Fourth, Dr. Natanzi asserted that petitioner's August 7, 2020 MRI showed fluid collection at the top of the infraspinatus tendon, which he opined is consistent with a vaccine-mediated inflammatory response. (Ex. 35, pp. 5-6.) However, after Dr. Abrams countered that only "trace" fluid was observed by the radiologist (Ex. A, p. 16), Dr. Natanzi ultimately conceded that "someone off the street with no shoulder pain can demonstrate even more fluid than was observed on [petitioner's] MRI" (Ex. 55, p. 3). He nonetheless opines it could be significant in light of petitioner's clinical history; however, Dr. Natanzi is not persuasive for the reasons discussed above in contending that petitioner experienced an abrupt onset of post-vaccination shoulder symptoms.

Fifth, citing Bokshan et al., Dr. Abrams opined that there are instead several indicators in petitioner's clinical history that her shoulder pain is more likely to be due to a cervical radiculopathy, including burning or electric pain originating in the neck and radiating through the shoulder, associated numbness and tingling, a pattern consistent with a nerve root origin, and pain in the lateral portion of the shoulder girdle. (Ex. A, p. 15.) Although Dr. Natanzi stressed that the presence of a cervical radiculopathy does not necessarily mean that a shoulder injury cannot also be present, he did not refute the presence of any of these findings in petitioner's case or suggest that they are not indicative of a cervical radiculopathy as Dr. Abrams had opined. (Ex. 55.) And, as noted above, Dr. Natanzi agreed as a general matter that cervical radiculopathy can cause shoulder pain. (Ex. 35, p. 4.)

Considering the record as a whole, I find that petitioner's diagnosed, pre-existing, and previously symptomatic cervical radiculopathy would explain her post-vaccination reports of shoulder pain. Additionally, petitioner's more acute, post-vaccination presentation is explained by her diagnosed cellulitis, though that initial presentation did not include a new onset of shoulder pain. Accordingly, petitioner has not met her preponderant burden of proof with respect to the fourth SIRVA criterion.

c. <u>SIRVA QAI (1) and (3) – No history of pain, inflammation or dysfunction of the affected shoulder and pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered</u>

The first SIRVA criterion requires that there be no relevant prior history of shoulder concerns (pain, inflammation, or dysfunction) that could explain the post-vaccination presentation (signs, symptoms, examination findings, and/or diagnostic studies). 42 C.F.R. § 100.3(c)(10)(i). That is, the prior history must be one that "would explain" the petitioner's post-vaccination presentation. *Id.* Thus, ambiguous or isolated notations of prior shoulder pain do not prevent a petitioner from meeting this criterion. *E.g.*, *Fry v. Sec'y of Health & Human Servs*., No. 18-1091V, 2020 WL 8457671, at *3 (Fed. Cl. Spec. Mstr. Dec. 16, 2020). The Table SIRVA criteria "does not necessarily require a spotless prior health history of the affected shoulder." *Kelly v. Sec'y of Health & Human Servs*., No. 17-1918V, 2022 WL 1144997, at *17 (Fed. Cl. Spec. Mstr. Mar. 24, 2022); *see also O'Leary, M.D. v. Sec'y of Health & Human Servs.*, No. 18-584V,

2021 WL 3046617, at *8 (Fed. Cl. Spec. Mstr. June 24, 2021) (finding the first SIRVA QAI met where petitioner had a prior remote history of shoulder trauma that had "recovered nicely").

The third SIRVA criterion requires that the post-vaccination pain and reduced range of motion be limited to the affected shoulder. 42 C.F.R. § 100.3(c)(10)(iii). This requirement does encompass an affirmative showing that the petitioner's presentation included a reduction in range of motion. *Bolick v. Sec'y of Health & Human Servs*., No. 20-893V, 2023 WL 8187307, at *6-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023). Otherwise, "the third SIRVA criterion is intended to ensure that SIRVA claims are limited to instances in which 'the condition is localized to the shoulder in which the vaccine was administered.'" *Durham*, 2023 WL 3196229, at *12 (emphasis omitted) (quoting 82 Fed. Reg. 6294, 6296)).

I have already concluded under the fourth SIRVA criterion that petitioner's symptoms, including her shoulder pain, would be explained by her pre-existing cervical radiculopathy and coincident cellulitis. Accordingly, she likewise cannot satisfy the first SIRVA criterion given that her cervical radiculopathy included documented pain affecting the left shoulder prior to vaccination. Moreover, given that I have concluded that petitioner's diagnosed cellulitis, a condition affecting her upper arm, and her diagnosed cervical radiculopathy, a condition affecting her neck, would explain her complete clinical presentation, including her left shoulder pain, it therefore follows that petitioner has not preponderantly demonstrated that she suffered a condition localized to her left shoulder pursuant to the third SIRVA criterion.

d. Causation-in-fact

Even where a petitioner cannot demonstrate the specific requirements of a Table SIRVA, it is still possible to demonstrate the presence of a shoulder injury caused-in-fact by vaccination. *E.g.*, *Durham*, 2023 WL 3196229, at *14-15 (explaining that "[c]laims involving shoulder pathology in the presence of significant and potentially confounding neurologic signs and symptoms are better addressed on a causation-in-fact basis"); *Layne v. Sec'y of Health & Human Servs*., No. 18-57V, 2022 WL 3225437 (Fed. Cl. Spec. Mstr. July 12, 2022) (finding petitioner entitled to a shoulder injury caused-in-fact by vaccination after determining that evidence of cervical radiculopathy prevented the finding of a Table SIRVA); *Colbert v. Sec'y of Health & Human Servs*., No. 18-166V, 2022 WL 2232210 (Fed. Cl. Spec. Mstr. May 27, 2022) (same). In order to demonstrate a shoulder injury caused-in-fact by her vaccination, petitioner must meet the three-part *Althen* test without the benefit of any causal presumption. Thus, petitioner must demonstrate by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury, in order to prove causation-in-fact. *Althen,* 418 F.3d at 1278.

Petitioner argues that she has presented a medical theory via Dr. Natanzi that shoulder injuries can be caused by needle overpenetration into the shoulder bursa and that this can lead to "immune-mediated inflammatory reactions and rotator cuff injuries resulting from the antigenic material introduced with vaccine administration." (ECF No. 73-1, p. 29 (quoting Ex. 35, p. 7).) Petitioner contends this theory is supported by the medical literature pertaining to SIRVA. (*Id.*) She asserts that a logical sequence of cause and effect implicates her vaccination because her shoulder pain began "within a logical timeframe following her vaccinations" and can be distinguished from her other ailments, including her cervical radiculopathy and cellulitis. (*Id*. at 31-32.) Given that she has relied on medical literature pertaining to SIRVA, she asserts that the timeframe that supports a causal inference is 48-hours post-vaccination. (*Id*. at 33.) In response, respondent does not dispute the mechanism advanced by petitioner, but argues that "SIRVA" is a medico-legal term, rather than a specific diagnosis. He contends that petitioner's reliance on an unspecified "left shoulder injury resulting from a vaccine needle overpenetration" is not a medically-recognized, defined injury, as required by the Vaccine Act. (ECF No. 74, pp. 19-20 (citing *Broekelschen v. Sec'y of Health & Human Servs*., 618 F.3d 1339, 1346 (Fed. Cir. 2010); *Lombardi v. Sec'y of Health & Human Servs*., 656 F.3d 1343, 1352 (Fed. Cir. 2011)).)

Although I accept petitioner's reliance on SIRVA literature for purposes of *Althen* prong one, *e.g.*, *Morris v. Sec'y of Health & Human Servs.*, No. 19-1570V, 2023 WL 5092691, at *6 (Fed. Cl. Spec. Mstr. July 11, 2023), respondent's argument is well taken with respect to petitioner's attempt to demonstrate a logical sequence of cause and effect under *Althen* prong two, explaining how her own condition could be vaccine caused. The lack of any clear diagnosis of a shoulder injury stands in contrast to petitioner's clear diagnoses of both cellulitis and cervical radiculopathy. Under a cause-in-fact analysis, these diagnoses remain more persuasive as explanations for petitioner's symptoms for all the same reasons as discussed above. *Winkler v. Sec'y of Health & Human Servs*., 88 F.4th 958, 963 (Fed. Cir. 2023) (holding that a special master can consider evidence of other possible sources of injury in evaluating petitioner's prima facie showing under *Althen* prong two). That is, the analysis under the second SIRVA QAI criterion explains why petitioner has not demonstrated that her shoulder pain occurred acutely after vaccination and the analysis under the fourth SIRVA QAI criterion explains why she is not persuasive in contending that a distinct shoulder injury is discernable. Moreover, although Dr. Natanzi purported to identify fluid collection at the supraspinatus tendon as evidence consistent with his medical theory, he ultimately conceded the finding was not significant, explaining "someone off the street with no shoulder pain can demonstrate even more fluid than was observed on [petitioner's] MRI." (Ex. 55, p. 3.) And, in any event, for the reasons previously discussed relative to her Table claim, petitioner has also not demonstrated that onset of her alleged shoulder injury occurred within 48 hours of vaccination as she argues would be compatible with her theory of causation.

For all these reasons, and considering the record as a whole, petitioner has not preponderantly demonstrated the presence of a shoulder injury caused-in-fact by her vaccination.

## VI. Conclusion

Petitioner clearly suffered and she does have my sympathy. However, for all the reasons discussed above, there is not preponderant evidence of any compensable injury under the standards set by this Program. Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master